UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

CIVIL ACTION NO.: 1:10CV-36-M

MAMMOTH RESOURCE PARTNERS, INC.                                        PLAINTIFF

v.

PHOENIX DRILLING, INC. and
BRADLEY T. LIGGETT                                                       DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon a motion filed jointly by the defendants, Phoenix Drilling, Inc. ("Phoenix") and Bradley T. Liggett, to dismiss, or alternatively, to stay [DN 7]. Fully briefed, this motion is ripe for decision.

### I. FACTUAL BACKGROUND

*Leslie County Drilling Program*

Mammoth alleges that in 2008, as part of a project known as the Leslie County Drilling Program, it was negotiating with Phoenix for certain drilling services to take place in Clay or Leslie County, Kentucky. (Pl.'s Comp. ¶ 7.) During these initial negotiations, Mike Howard, Phoenix's operation manager, advised Mammoth that it could take advantage of certain tax laws by prepaying for drilling services before the end of the calendar year. (Id. ¶ 10.) The parties agreed that those funds would then be utilized only for drilling services that took place on the Leslie County Drilling Program should their contract negotiations be successful. (Id.) If the parties could not agree to the terms of a contract, however, all of the funds were to be returned to Mammoth. (Id.)

Based upon these assurances, Mammoth agreed to prepay for the drilling services and wrote a check for $675,000 to be held by Phoenix in escrow. (Id. ¶ 11.) Defendant, Bradley Liggett, Phoenix's President, accepted the funds on Phoenix's behalf and deposited the funds in a commercial checking account on January 5, 2009. (Id. ¶ 12.) However, a contract was never successfully negotiated. (Id. ¶ 13.) Therefore, on September 1, 2009 and September 17, 2009, Mammoth requested that Phoenix return the $675,000. (Id.) Instead, Phoenix only issued a check to Mammoth in the amount of $376,997.77 contending that the remaining amount, $298,002.23, was being withheld as a "setoff" for invoices that Mammoth owed Phoenix on an unrelated drilling project in Bell County, Kentucky. (Id. ¶¶ 13-14.) Mammoth brought this action pursuant to the Court's diversity jurisdiction alleging that defendants' conduct constitutes a breach of contract by Phoenix, a breach of Liggett's fiduciary duties, and conversion, among other things.

*Bell County Contract*

In West Virginia state court, Phoenix filed a complaint against Mammoth alleging that the parties had contracted for the performance of drilling services regarding certain well sites in Bell County, Kentucky (the "Bell County Contract"). (DN 7, Ex. A ¶¶ 4, 6.) Under the Bell County Contract, Phoenix alleges that it was required to perform drilling services for Mammoth, and that it did in fact perform those drilling services to the specifications required by the contract. (Id. ¶¶ 9-10.) In exchange, Mammoth promised to pay for those services. (Id. ¶ 10.) Phoenix contends that Mammoth breached the Bell County Contract by failing to pay for invoices totaling $296,692.23.

In its answer to that complaint, Mammoth admitted that to date, it has not paid for any of the invoices submitted by Phoenix. (DN 7, Ex. E ¶ 12.) However, it noted that Phoenix converted funds totaling $298,002.23 in relation to the Leslie County Drilling Program and indicated that it had filed this action in the Western District of Kentucky to recover those funds. (Id.) It also filed a counterclaim alleging that Phoenix negligently carried out its obligations under the Bell County Contract and that such negligence constituted a breach of contract. (Id. at 4-5.)

## II. PERSONAL JURISDICTION

Liggett argues that the claims against him should be dismissed because the Court is unable to obtain personal jurisdiction over him. In particular he contends that he lacks the requisite contacts with Kentucky that would permit this Court to exercise such jurisdiction. For the following reasons, the Court agrees.

### A. Standard

In a diversity case, a federal court determines whether personal jurisdiction exists over a nonresident defendant by applying the law of the state in which it sits. Third Nat'l Bank in Nashville v. WEDGE Group Inc., 882 F.2d 1087, 1089 (6th Cir. 1989). Kentucky's long-arm statute, KRS 454.210, has been understood to reach the limit permitted by the Constitution. Wilson v. Case, 85 S.W.3d 589, 592 (Ky. 2002). Thus, the single question is whether the jurisdiction sought is within the requirements of due process. The Supreme Court has repeatedly held that if a defendant is not present in the forum state, in order to subject him to an in personam judgment, he must have "certain minimum contacts with it such that

maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).

In Southern Mach. Co. v. Mohasco Indus., Inc., 401 F.2d 374 (6th Cir. 1968), the Sixth Circuit set forth a three-part test for determining whether, consistent with due process, personal jurisdiction may be exercised over a defendant. "First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction reasonable." Id. at 381; see also WEDGE, 882 F.2d at 1089-90.

The plaintiff has the burden of establishing that these jurisdictional requirements are satisfied, but need only make a prima facie showing of jurisdiction. Welsh v. Gibbs, 631 F.2d 436, 438 (6th Cir. 1980) (citing Weller v. Cromwell Oil Co., 504 F.2d 927 (6th Cir. 1974)). To support an allegation of personal jurisdiction, a plaintiff usually submits affidavits and other written evidence from outside of the pleadings to meet its burden, see, e.g., 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1351 (3d ed. 2004), and this evidence, along with the allegations in the complaint are viewed "in the light most favorable to the [plaintiff.]" Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883, 887 (6th Cir. 2002) (citation omitted). The plaintiff satisfies its burden by "establishing with reasonable particularity sufficient contacts between [the defendant] and the forum state to support

4

jurisdiction." Id. (quotation omitted).

### B. Purposeful Availment

*Alleged Contacts*

The plaintiff alleges that Liggett "made all relevant decisions as it pertained to the handling of and/or failure to return the escrow proceeds of the Plaintiff once deposited with the Defendant Phoenix Drilling, Inc." (Compl. ¶ 4.) Liggett acknowledged receiving the escrow funds of $675,000 on January 5, 2009, which were subsequently deposited into Phoenix's bank account in West Virginia. (Id. ¶¶ 11-12.) Furthermore, Mammoth alleges that "Liggett ha[s] refused to remit the remainder of the prepaid drilling funds on the Leslie County Drilling Program[,]" (id. ¶ 15,) despite Liggett's assurances that the funds "would be escrowed and segregated in a separate account and that the funds would be returned to Mammoth in their entirety[,]" (id. ¶ 40.)

Based upon these allegations, Liggett's tortious activity all occurred in West Virginia. He received the money there, he deposited the money there, he refused to return the money from there, and thus, he apparently committed fraud, conversion, and breached his fiduciary duties there. There is simply no allegation that Liggett acted in Kentucky. Nevertheless, Mammoth urges this Court to exercise personal jurisdiction over Liggett because the effects of his conduct were felt in Kentucky. After all, Mammoth alleges that Liggett's conduct was directed towards a Kentucky citizen and surely Liggett should have realized that the effects of his conduct would have been felt in Kentucky. There is some merit to this argument in the context of intentional torts. "The Supreme Court has recognized that the analysis shifts slightly when the application

5

of the purposeful availment prong turns on a tort or fraud-based claim." Spectrum Scan, LLC v. AGM Cal., 519 F. Supp. 2d 655, 659-60 (W.D. Ky. 2007) (quotation omitted).

*Effects Test*

In Calder v. Jones, 465 U.S. 783, 785-87 (1984), the Supreme Court held that the defendants, Florida residents, having published a defamatory article in the National Enquirer, could be haled into a California court where the subject of the article resided. "The court concluded that because the defendants allegedly committed an intentional tort, knowing it would have a potentially devastating impact upon the plaintiff, and knowing that the plaintiff would be primarily injured in the state in which she lived and worked and in which the magazine had its largest circulation, the defendants 'must reasonably anticipate being haled in court there to answer for the truth of the statements made in their article.'" Wallace v. Herron, 778 F.2d 391, 394 (7th Cir. 1985) (quoting Calder, 465 U.S. at 790). This Calder holding, also known as the "effects test," has been read narrowly by the various circuits, including the Sixth Circuit. Air Prods. & Controls, Inc. v. Safetech Int'l, Inc., 503 F.3d 544, 552 (6th Cir. 2007). Simply put, "the mere allegation of intentional tortious conduct which has injured a forum resident does not, by itself, always satisfy the purposeful availment prong." Id. (citing Scotts Co. v. Aventis S.A., 145 F. App'x 109, 113 n.1 (6th Cir. 2005)).

In Neal v. Janssen, 270 F.3d 328 (6th Cir. 2001), the Sixth Circuit applied the "effects test" in the context of a fraud claim. The court held that "[t]he acts of making phone calls and sending facsimiles into the forum, standing alone, may be sufficient to confer jurisdiction on the foreign defendant where the phone calls and faxes form the bases for the action." Neal v.

6

Janssen, 270 F.3d at 332 (citing Oriental Trading Co. v. Firetti, 236 F.3d 938, 943 (8th Cir. 2001)). In Neal, the plaintiffs, who hired the defendant to sell their horse, alleged that the defendant "intentionally defrauded them in phone calls and faxes directed to plaintiffs or their agents in Tennessee about the price he received from the sale of" the horse. Id. Concluding that the court could exercise personal jurisdiction over the defendant, the court held that "[w]hen the actual content of the communications into the forum gives rise to an intentional tort action, that alone may constitute purposeful availment. . . . Furthermore, the actions of sending false information into Tennessee by phone and fax had foreseeable effects in Tennessee and were directed at individuals in Tennessee. These false representations are the heart of the lawsuit-they were not merely incidental communications sent by the defendant into Tennessee." Id. (emphasis added).

Courts in the Western District of Kentucky have also held that allegations of fraud directed towards citizens of Kentucky are sufficient, under certain circumstances, for Kentucky courts to exercise jurisdiction over the out-of-state defendant. In D.C. Micro Dev., Inc. v. Lange, 246 F. Supp. 2d 705 (W.D. Ky. 2003), the court concluded that the exercise of personal jurisdiction was proper where the defendant allegedly hacked into a server located in Kentucky and sent mass emails to Kentucky residents fraudulently urging them to "upgrade" their product to one owned by the defendant. D.C. Micro, 246 F. Supp. 2d at 712. More recently, the court exercised jurisdiction over an out-of-state defendant that solicited Kentucky residents through e-mails, telephone calls, and faxes to invest in an abusive tax shelter. Kerman v. Chenery Assocs., Inc., No. 3:06CV-338-S, 2007 WL 2363283, *2 (W.D. Ky. Aug. 14, 2007).

*Liggett Lacks Requisite Contacts with Kentucky*

In Spectrum Scan, the court made two observations about these cases. First, the court noted that "[i]n Neal, D.C. Micro, and Kerman, the claims involved fraud of some type and personal jurisdiction was premised on the notion that the 'communications themselves create the tort.'" Spectrum Scan, 519 F. Supp. 2d at 660 (quoting Kerman, 2007 WL 2363283, at *2). Second, in each of those cases, "the communications involved were fraudulent with respect to *present or past material facts*, not as to future intentions in a contractual relationship." Id. (emphasis added). Therefore, the Court in Spectrum Scan found that it lacked personal jurisdiction over the defendant in a claim for fraudulent misrepresentation where the misrepresentation pertained to a promise contained in a negotiated contract. Id. at 661. The rationale is clear. When an individual misrepresents a past or present fact, the communication itself is the tort. But where the allegation is that the party only failed to perform according to the terms of the contract, the wrong does not occur until the party fails to live up to the bargain he negotiated. It is this failure to perform that is the heart of the lawsuit.

Like Spectrum Scan, Mammoth's allegation of fraud is premised upon a promise of future performance that was also a term of a negotiated contract. In counts five and six for fraud, Mammoth alleges that Phoenix and Liggett promised that "the $675,000 in prepaid drilling funds would be escrowed and segregated in a separate account and that the funds would be returned to Mammoth in their entirety if Mammoth requested the return of said funds . . . . Such statements were false . . ." (Compl. ¶¶ 40-41.) In count one for breach of contract, Mammoth alleges that the same conduct constitutes a breach of contract: "As part of the terms

8

of the escrow contract Phoenix Drilling agreed not to release any of the escrow funds for any other purpose other than for the drilling of the Leslie County Drilling Program wells. As a further condition of the escrow contract Phoenix agreed to return the prepaid drilling funds in their entirety if Mammoth and Phoenix could not reach a subcontract drilling agreement for the drilling of such wells. . . . Phoenix, however, has breached the terms of the escrow contract and its express or implied contractual commitments by failing to return in its entirety the $675,000.00 . . . ." (Id. ¶¶ 19-20.) Based upon these allegations, it was not a communication into Kentucky that gave rise to Mammoth's fraud claim, but rather, it was Phoenix's failure to act according to the terms of the escrow agreement. In light of the Sixth Circuit's admonition that "the mere allegation of intentional tortious conduct which has injured a forum resident does not, by itself, always satisfy the purposeful availment prong," Air Prods., 503 F.3d at 552, the Court agrees with Spectrum Scan and finds that the allegations in Mammoth's complaint are insufficient to "establish[] with reasonable particularity sufficient contacts between [Liggett] and the forum state to support jurisdiction." Neogen Corp., 282 F.3d at 887. The Court will therefore grant Liggett's motion to dismiss for lack of personal jurisdiction.

### III. MOTION TO DISMISS FOR IMPROPER VENUE

Next, Phoenix argue that pursuant to Fed. R. Civ. P. 12(b)(3), this matter should be dismissed because it is proceeding in an improper venue. Phoenix contends that the appropriate venue is in West Virginia where the court there will be able to determine the validity of its setoff. In fact, Phoenix argues that Mammoth's claim was required to have been brought as a compulsory counterclaim in that court. The Court disagrees.

The Court notes that these two concurrent actions involve the conduct of the parties surrounding two separate and distinct contracts. The state court case deals with Mammoth's alleged failure to pay invoices in connection with the Bell County Contract whereas this federal case deals with Phoenix's alleged failure to return money from escrow in connection with the Leslie County Drilling Program. Furthermore, a claim for set-off, by definition, "arise[s] from a transaction separate from the subject matter of the opposing party's claim. 3 James Wm. Moore, et al., Moore's Federal Practice § 13.31 (3d ed. 2010). Therefore, by arguing that its debt to Mammoth is subject to setoff, the defendant acknowledges that the claims do not arise out of the same transaction or occurrence and, therefore, are not required to be brought as compulsory counterclaims.

Even if Mammoth were required to bring this action as a compulsory counterclaim in West Virginia, venue would not be rendered improper here. That is because venue is not controlled by Fed. R. Civ. P. 13(a) or West Virginia's rule regulating compulsory counterclaims. Rather, venue is controlled by 28 U.S.C. § 1391 which provides:

> A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a). Phoenix has not argued that venue is improper under this statute, therefore the Court does not decide that question here. And because the Court disagrees with the argument that Phoenix raised in its motion to dismiss, it will deny that motion. However,

Phoenix is not foreclosed from bringing a subsequent motion to dismiss under § 1391 or a motion for change of venue under 28 U.S.C. § 1404 or § 1406.

## IV. MOTION TO STAY

Phoenix also requests that the Court stay these proceedings pending the resolution of the merits of the state court action. According to Phoenix, this would allow the parties to focus their efforts in one forum and would allow this Court to have the benefit of the views of the state court.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes in its docket with economy of time and effort for itself, for counsel and for litigants." Landis v. N. Am. Co., 299 U.S. 248, 254 (1936). "[T]he burden is on the party seeking the stay to show that there is pressing need for delay, and that neither the other party nor the public will suffer harm from entry of the order." Ohio Envtl. Council v. United States Dist. Court, 565 F.2d 393, 396 (6th Cir. 1977). The decision to stay "ordinarily rests with the sound discretion of the District Court." Id. In the context of concurrent state and federal proceedings, a court will generally stay the federal action where the resolution of the state court proceeding may moot the action pending in federal court. Lerco Corp. v. Haley, 597 F. Supp. 517, 521-22 (W.D. Ky. 1983) (staying the federal court action where the federal action alleged many of the same facts as the state court action).

Although these concurrent proceedings deal with two separate and independent contracts, the matters being litigated may overlap. If, for example, this Court is called upon to determine the proper *amount* of setoff, judicial resources will necessarily overlap. But if the Court simply

determines whether a setoff was permitted under the escrow agreement without deciding the proper amount of the setoff, then such duplication of resources can be avoided. Therefore, to avoid any overlap, the issues that must be decided here are very narrow. The Court will only address whether Phoenix was permitted under the escrow agreement to perform an extrajudicial setoff. If the Court concludes that Phoenix did have such a right, then it will be necessary to stay this action giving the West Virginia court an opportunity to determine how much Mammoth owes Phoenix under the Bell County Contract, and therefore, the amount Phoenix was permitted to withhold from the escrowed funds. If the Court concludes that Phoenix did not have a right to setoff, then a judgment can simply be entered in favor of Mammoth for the amount that Phoenix withheld from the escrowed funds plus any other damages that may be proved. Because the issues the Court will decide are narrow, a stay is unnecessary at this time.

## V. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Lastly, Liggett argues that the claims against him for breach of fiduciary duty and for aiding and abetting Phoenix's breach of fiduciary duty should be dismissed because the complaint does not state a claim upon which relief can be granted. Because the Court has determined that all claims against him should be dismissed for lack of personal jurisdiction, this motion is now moot.

## VI.  CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that the motion by the defendants, Phoenix Drilling, Inc. and Bradley T. Liggett, to dismiss or to stay [DN 7] is **GRANTED in part and DENIED in part**.  The motion to dismiss is granted with respect Bradley T. Liggett for lack of personal jurisdiction.  It is denied in all other respects.


cc:     Counsel of Record